277 F.2d 586
 60-1 USTC P 9393
 Lambert WILLETT, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Mary T. WILLETT, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
John L. WILLETT, Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Thompson and Virginia S. WILLETT, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 13731-13734.
 United States Court of Appeals Sixth Circuit.
 April 12, 1960.
 
 Charles I. Dawson, Louisville, Ky. (Bullitt, Dawson & Tarrant, John A. Fulton, of Woodward, Hobson & Fulton, Rucker Todd, Louisville, Ky., on the brief), for petitioners.
 Morton K. Rothchild, Washington, D.C. (Charles K. Rice, Lee A. Jackson, Robert N. Anderson, Washington, D.C., on the brief; Arch M. Cantrall, John M. Morawski, Dept. of Justice, Washington, D.C., on docket), for respondent.
 Before MARTIN, CECIL and WEICK, Circuit Judges.
 CECIL, Circuit Judge.
 
 
 1
 The principal question involved in this appeal from the Tax Court is whether or not gain resulting from certain transactions is ordinary income to Willett Brokerage Company, a partnership, for the sale of its inventory of whiskey or a capital gain derived from the sale of the common stock of Wildwood Corporation.
 
 
 2
 The history of the organization of the partnership of Willett Brokerage Company, Wildwood Corporation and the Willett Distillery Company, a Kentucky Corporation are found in the Findings of Fact of the trial judge. T.C. Memo. 1957-189.
 
 
 3
 The validity of the partnership is not in issue. It was formed by agreement dated January 1, 1945. Lambert Willett, his wife Mary T. and four of their children were the original partners. Subsequently other children were brought into the partnership through gifts of partnership interests from the mother and father. These gifts have been sustained by the Tax Court so that at the time of the transactions with which we are concerned the partnership consisted of the father, mother, one daughter and seven sons. All of these parties entered into a new agreement June 25, 1946. Each held interests in varying proportions.
 
 
 4
 The partnership carried on a wholesale business in whiskey, making sales in bulk and bottles through the sale of warehouse receipts. During the years 1945 through 1947 sales were made in excess of one million dollars. The partnership made its last purchase of whiskey on May 2, 1946 when it purchased 589 barrels from the distilling corporation.
 
 
 5
 Wildwood Corporation was organized under Kentucky laws, July 30, 1947 and on July 31 a written agreement was executed between it and Willett Brokerage Company whereby about 58% Of the assets of the partnership were transferred to the corporation in exchange for stock.
 
 
 6
 The distribution of assets between the partnership and corporation was as follows: Of a total of $49,253.47 cash in bank $39,332.14 was left in the partnership and $9,921.33 was transferred to the corporation; out of a total of $139,877.52 in bulk whiskey (warehouse receipts) $209.70 was left in the partnership and $139,667.82 was transferred to the corporation; $1,240.30 cases (bottled goods) was retained in the partnership and $24,484.93 was transferred to the corporation; total cooperage in the amount of $12,539.74 was retained by the partnership; all of the office equipment less reserve was transferred to the corporation in the amount of $611.70; all notes receivable and accrued interest amounting to $75,950 were retained by the partnership; prepaid insurance in the sum of $1,355.64 was left in the partnership and $2,690.23 was transferred to the corporation; thus of the total assets $130,627.52 remained with the partnership and $177,376.01 was transferred to the corporation. Liabilities of accounts payable, taxes payable and notes payable in the amount of $144,376.01 were assumed by the corporation. Liabilities of notes payable in the sum of $420 were kept by the partnership. These distributions gave the corporation a net worth of $33,000 for which 330 shares of stock were issued to the partners in proportions equal to their interests in the partnership. The partners then executed notes to the corporation in the sum of $67,500 for preferred stock of the same par value and in proportions to the stockholders equal to their common stock holdings.
 
 
 7
 About August 6 while Thompson Willett and his father were in Chicago in the interest of making sales of whiskey, Thompson received a call from Mr. Fred Metzger, a whiskey broker of New York, advising him that he had a client who was interested in buying the shares of wildwood Corporation. Thompson had previously discussed with Metzger the matter of selling the partnership interests including its inventory of whiskey. In connection with this possible sale Willett Brokerage Company sent an inventory to Metzger on July 3. Metzger in turn sent this inventory to J. E. Friel, an officer of Joseph E. Seagram and Sons Company, on July 7. This was substantially the same inventory that passed from the partnership to Wildwood Corporation on July 31.
 
 
 8
 On August 19, through Metzger, Thompson Willett, his father, their lawyer and accountant met Mr. Friel. Two days later they agreed on a price of Wildwood shares based on the market value of the inventory of whiskey. The proposition was carried back to Bardstown, Kentucky, where as alleged it was vigorously discussed among the family stockholders. All of the stockholders agreed to sell and an agreement which was dated back to August 15 was signed Sept. 19.
 
 
 9
 The partnership was dissolved in May 1948. The notes given for the purchase of preferred stock were returned to the makers and this stock cancelled. The corporation made two sales of whiskey after its incorporation and before the sale of its stock. These were sales to R. L. Buse Company of Cincinnati of 50 and 10 barrels of whiskey made on August 8 and 11, respectively. It also secured a Federal permit to engage in the business of wholesale liquor dealer. Mr. Metzger, the whiskey broker who brought the parties together and negotiated the sale, received his commission for the sale of the whiskey. The partnership made further sales of whiskey in October and December of 1947 in excess of $5,000.
 
 
 10
 A detailed statement of the facts may be found in the Findings of the Trial Judge as reported in T.C. Memo 1957-189. The facts as found are not in dispute. It is claimed however that there was an omission to make findings from certain pertinent and uncontradicted testimony.
 
 
 11
 The record discloses that there was testimony upon these alleged items upon which the Trial Judge made no findings. Although there was such testimony the Trial Judge could give it such weight as she thought it merited. She was entitled to base her conclusions upon that testimony which under all of the circumstances carried the most weight and seemed the most logical and reasonable.
 
 
 12
 Section 7482 of Title 26 U.S.C. gives the United States Courts of Appeals exclusive jurisdiction to review the decisions of the Tax Court. This statute was amended in 1948 by adding to the words 'shall have exclusive jurisdiction to review the decisions of the Tax Court' the phrase 'in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury.' Since this amendment Rule 52(a) of the Federal Rules of Procedure, 28 U.S.C. is applicable to reviews of the Tax Court as it is to reviews of civil actions tried in district courts without a jury. Therefore, 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' This amendment came before this Court shortly after it was adopted in Wright-Bernet, Incorporated, v. Commissioner of Internal Revenue, 172 F.2d 343. Although the Court reversed the Tax Court it applied the clearly erroneous rule. Commissioner v. Consolidated Premium Iron Ores, Limited, 6 Cir., 265 F.2d 320, 326. Miles-Conley Co. v. Commissioner, 4 Cir., 173 F.2d 958.
 
 
 13
 Counsel for the petitioners contend that the Trial Judge erred in the conclusions drawn from the undisputed facts. It is stated in the opinion 'After considering carefully the entire record, all of the circumstances, and all of the argument and contentions of the petitioners we conclude that there was in substance a single transaction under which the Willett Brokerage Company, the partnership, sold an inventory of whiskey warehouse receipts in the ordinary course of its business to two affiliates or subsidiaries of Joseph E. Seagram & Sons Co., in which transaction the creation of Wildwood Corporation was one step, the sale of its common stock was another step, and Wildwood Corporation was merely a conduit through which the inventory of whiskey warehouse receipts passed to those who desired to acquire them.' (469a petitioners' appendix)
 
 
 14
 As part of the reasoning to sustain the conclusions and in answer to arguments advanced by counsel for the petitioners the Trial Judge took the position that partnership interests could not be sold and be given capital gains' treatment. There was some conflict on this point in 1947. The Commissioner's ruling did not permit capital gains' treatment in such sales. This view was supported by City Bank Farmers Trust Co. v. United States, 1942, 47 F.Supp. 98, 97 Ct.Cl. 296. The opposite view is taken by the following cases: Commissioner of Internal Revenue v. Shapiro, 6 Cir., 1942, 125 F.2d 532, 144 A.L.R. 349; Thornley v. Commissioner of Internal Revenue, 3 Cir., 1945, 147 F.2d 416; McClellan v. Commissioner of Internal Revenue, 2 Cir., 1941, 117 F.2d 988; Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 283.
 
 
 15
 The Trial Judge also considered that there was a tax advantage to the purchaser to buy from a corporation rather than a partnership.
 
 
 16
 It is claimed that this reasoning of the Trial Judge is erroneous but a reviewing court may sustain a judgment if for any reasons it finds that it is proper and correct. Securities and Exchange Commission v. Chenery Corporation, 1943, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626; Helvering v. Gowran, 1937, 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224; Sherman v. Air Reduction Sales Co., 6 Cir., 1958, 251 F.2d 543: Ginsburg v. Black, 7 Cir., 1956, 237 F.2d 790, certiorari denied 353 U.S. 911, 77 S.Ct. 669, 1 L.Ed.2d 665; In re Barlum Realty Co., 6 Cir., 1946, 154 F.2d 562.
 
 
 17
 The Trial Judge drew an inference from all of the facts, the sequence of events and the entire record that the purchaser was not interested in buying interests of a partnership.
 
 
 18
 Thompson Willett testified, 'I know one thing that Mr. Friel very definitely told me, and he said that he did not want to buy any property, any physical property except whiskey. Well, I said that it was a coincidence, I said, 'It's a coincidence, Mr. Friel, that we don't have anything else to sell right now; I couldn't sell you the distillery because the distillery burned on the 14th of August, substantially burned." (163a petitioners' appendix) There may have been other advantages to the purchaser in buying the stock of a corporation rather than the interests of a partnership, but we are concerned only with what the parties actually did.
 
 
 19
 The distribution of the assets between the partnership and the corporation gives rise to a persuasive fact in this case. If the sole consideration of the partners had been to do business through a corporation rather than a partnership it would have been logical for them to have transferred all of the assets. It is significant that aside from the paper transaction of issuing notes for preferred stock 98% Of the assets of the corporation consisted of whiskey and cash transferred from the partnership.
 
 
 20
 After a careful reading of the entire record submitted by the petitioners and consideration of all the facts and circumstances in these cases we consider that there is ample evidence to support the Findings of Fact and the conclusions and inferences drawn therefrom. They are not clearly erroneous.
 
 
 21
 Counsel for the petitioners contend that the clearly erroneous rule is not applicable to conclusions drawn by the Trial Judge from undisputed facts.
 
 
 22
 In Commissioner of Internal Revenue v. Consolidated Premium Iron Ores, Limited, supra, it was pointed out by this Court that not only is there a conflict in the Circuits on this point but there are also conflicts on it within the Circuits. This is true in the Sixth Circuit. (See cases cited in the Consolidated Premium Iron Ores case.) On this question we adhere to the view expressed in the Consolidated Premium Iron Ores case.
 
 
 23
 It is conceded by counsel for the petitioners that the decision in reference to the sale of shares of Wildwood Corporation will be conclusive as to the nature of the sales to Buse. It is not necessary therefore to discuss the second question presented on behalf of petitioners.
 
 
 24
 For the reasons herein expressed the judgment of the Tax Court is affirmed.
 
 
 25
 WEICK, Circuit Judge (dissenting).
 
 
 26
 In my judgment, the decision of the Tax Court, which the majority upholds, is not supported by substantial evidence adduced at the trial. Accordingly, I cannot concur therein.
 
 
 27
 The basic premise of the Tax Court's decision resides in the following excerpt thereof:
 
 
 28
 'Wildwood Corporation was created to perform the function of serving as a conduit for the transfer of an inventory of whiskey warehouse receipts from the partnership to the two purchasers, Distillers Distributing Corporation (Seagrams) and the West Shore Wine and Liquor Company.'
 
 
 29
 In substance, this means that the corporation was created in furtherance of a plan to sell the whiskey to these two companies.
 
 
 30
 The date found by the Tax Court as that upon which the first mention of any possible sale occurred was July 1, 1947. It was on that date that Fred Metzger solicited a list of inventory from the Willett Brokerage Company.
 
 
 31
 The undisputed testimony of the Willetts, corroborated by their counsel, was that counsel was instructed in June 1947[1] to proceed with the incorporation of Wildwood.
 
 
 32
 That simple fact, I believe, is destructive of the Tax Court's decision and requires a reversal thereof.[2] I cannot accept as correct a decision that the incorporation was a direct result of the proposed sale to Seagrams, when the Tax Court found as a fact that the first time any possible sale to that company was discussed was subsequent to the date on which counsel was instructed to proceed with the incorporation. In order that the sale have fostered the corporation it must have preceded it in point of time. It did not. Therefore, simple logic dictates the conclusion that the corporation was not the child of the sale.
 
 
 33
 This Court, in United States v. Cummins Distilleries Corp., 1947, 166 F.2d 17 decided that the proceeds of the sale of whiskey warehouse receipts assigned to the shareholders of a corporation in the process of liquidation were taxable to the shareholders as capital gains, and not to the corporation. The evidence showed that the corporation had not carried on definitive negotiations for the sale prior to the decision to liquidate, although prior thereto it had considered such a sale at an indefinite future date. The first time any negotiations between the Willetts and Seagrams were carried on it this case was August 19, 1947, approximately three weeks after incorporation and about two months after the final decision to incorporate was reached.
 
 
 34
 Petitioners' position is strengthened by the fact that the secondary evidence supports the conclusion that Wildwood was incorporated with the objective of continuing as a functioning concern.
 
 
 35
 Thompson Willett and John Willett both testified that counsel had advised the Willetts that incorporation was advisable in 1947 only if they were intending to continue in business. Counsel was of the opinion that, in the event of a sale, capital gains treatment could be obtained on the sale of the several undivided partnership interests. That this was in fact his opinion, and that the advise was given, was testified to by attorney Bernard H. Barnett, one of Willetts' counsel in 1947.[3]
 
 
 36
 Here it may be noted that at the outset of the brokerage venture the Willetts preferred the use of the corporate entity, but were advised against it by counsel at that time. Counsel was of the opinion that a partnership was preferable until such time as the excess profits tax was repealed. In late 1946, when it appeared that this would come about, counsel was instructed not to proceed with incorporation because at that time a sale of the partnership business was being contemplated. I am unable to square the fact that incorporation was originally forestalled because a sale was pending with a finding that the ultimate incorporation was had solely to implement a sale.
 
 
 37
 I also find it quite difficult to consider the expenditure of the time and money incident to incorporation to be a part of a sham in order to obtain capital gains treatment on a sale when competent counsel had given a reasonably substantiated opinion that the same treatment could be obtained for the sale of partnership interests. In the absence of strong affirmative evidence in support thereof, a finding that a business reorganization, which involved the incurring of expense, was made in order to secure a tax advantage which the parties were already possessed of is untenable.
 
 
 38
 The activities of the Willetts around the time of incorporation were consistent with an intention to continue in business. At that time Willett Distillery Company had no whiskey suitable for bottling or sale. In early august 1947 Lambert and Thompson Willett went to Chicago to contact a retail dealers organization with regard to acting as an outlet for Wildwood Corporation. Construction of a bottling plant had been undertaken by the distillery company and three thousand cases of glass bottles, subject to deterioration, were purchased by it. The construction of the bottling plant and the purchase of the bottles by the distillery were for the purpose of bottling the bulk whiskey in the hands of Wildwood. Transfer of basic permits, insurance, applications for labels, etc., all necessary for a functioning business, were made by Wildwood. If a decision had already been reached to sell all the saleable whiskey then in the hands of the partnership, all this becomes mere 'window dressing' for the sham. I cannot conceive of it as such.[4]
 
 
 39
 The agreement between the partnership and the corporation for the transfer of assets in exchange for shares of stock was entered into on July 31, 1947 and provided that the exchange shall be completed as of the first moment of business on August 1, 1947. While it is true that only 58% Of the partnership's assets were transferred to the corporation, they represented 99% Of the whiskey (both warehouse receipts and bottled goods) held by it. About $10,000 in operating capital was put into the corporation. There was no evidence that this was insufficient capitalization for that type of business. The bulk of the assets retained by the partnership were cash and notes receivable. In order to function as a whiskey brokerage a firm requires substantial amounts of whiskey, and that is what the partnership transferred to the corporation. The fact that they retained a large amount of liquid assets is not, to my point of view, of any great significance.
 
 
 40
 The circumstances surrounding the sale itself do not accord with a finding that the corporation was created in aid thereof.
 
 
 41
 As previously pointed out, Metzger was furnished a copy of the Willetts' inventory on July 1, 1947. However, even at that time, he was told that if the whiskey was to be sold the partners would consider selling their interests in the partnership in preference to selling the whiskey warehouse reciepts in order to obtain capital gains treatment for the profits realized. In writing to Seagrams on July 7, 1947 Metzger stated 'a partnership, the Willett Brokerage Company, wants to sell the partnership with all the whiskey it owns.' This is a further manifestation of the Willetts' basic intention-- either to sell their proprietary interests in their business or continue as a going concern. The form in which the sale of the proprietary interests was consummated, carrying out their initial intent, whether as a sale of stock or undivided partnership interests, is secondary to the intent of the parties in making the sale. After obtaining the list of inventory Metzger transmitted the same to J. E. Friel of Seagrams, but received no response thereto. He testified that he, at that time, considered his efforts as unsuccessful and went on vacation. No interest was evidenced by Mr. Friel in making a purchase until August 4, 1947.
 
 
 42
 At about that date Metzger contacted Lambert and Thompson Willett, who were then in Chicago on the business trip previously mentioned, and told them that someone who had read of the incorporation of Wildwood wanted to know if it might be bought. The Willetts said they were willing to discuss the matter and on August 19, 1947 met Metzger in New York City. It was not until then that Metzger revealed that the other party to the proposed transaction was Seagrams. As heretofore pointed out, by that time the corporation was an existing legal entity carrying on its business.
 
 
 43
 At that meeting a tentative agreement was reached. But that agreement was not consummated then, and the entire deal almost collapsed over a question as to whether certain taxes were to be included in the sale price. When a compromise figure was agreed upon the deal was presented to the entire Willett family for approval. Several of the group were opposed to the sale and had to be persuaded by the others to agree to it.
 
 
 44
 The Tax Court held that the corporation was formed specifically in conjunction with the Seagrams sale. The articles of incorporation were filed on July 30, 1947 pursuant to the instructions given in June. Not until August 4th did Seagrams, who appears to have been the moving party to the transaction, notify Metzger of its interest in making a purchase. Not until August 19th did the Willetts know they would be negotiating with Seagrams. Not until the last minute was an agreeable sale price reached, and it was not ratified without some difficulty. Had the corporation been formed in contemplation of a specific sale is it not reasonable that the sellers would have had some idea to whom they were selling and at what price, long before they did?It is my opinion that the Tax Court could not properly draw the conclusions which it did from the evidence and its decision is clearly erroneous.
 
 
 45
 In United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, the Court held:
 
 
 46
 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court * * * is left with the definite and firm conviction that a mistake has been committed.'
 
 
 47
 I would reverse the decision of the Tax Court.
 
 
 
 [1]
 B. H. Barnett, counsel, testified that to the best of his recollection the instructions were given early in the month, although no exact date was established
 
 
 [2]
 In my judgment, the Tax Court's decision must fall under either the 'clearly erroneous' test or the rule that the Court of Appeals is free to draw its own conclusions from undisputed facts. Under either test the judgment cannot stand
 
 
 [3]
 The Court states that there was some conflict on this question in 1947. The conflict was between the Commissioner, supported by one ruling of the Court of Claims, City Bank Farmers Trust Co. v. U.S., 47 F.Supp. 98, 97 Ct.Cl. 296, and the United States Courts of Appeals in solid opposition, C.I.R. v. Shapiro, 6 Cir., 1942, 125 F.2d 532; Thornley v. C.I.R., 3 Cir., 1945, 147 F.2d 416; McClellan v. C.I.R., 2 Cir., 1941, 117 F.2d 988; Stilgenbaur v. U.S., 9 Cir., 1940, 115 F.2d 283. In light of the fact that this Court had held the sale of a partnership interest to be the sale of a capital asset in Comm'r. v. Shapiro, supra, counsel can be said to have been on reasonably firm ground in so advising the Willetts as to the law in this Circuit. The Commissioner of Internal Revenue has since adopted this viewpoint. G.C.M. 26379, C.B. 1950-1, page 58
 
 
 [4]
 The corporation did, in fact, during its short life make a sale of 60 barrels of whiskey in a transaction totally unrelated to the Seagram's sale