E. Keith OWENS, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 76–1159.

United States Court of Appeals, Sixth Circuit.

Argued April 11, 1977.

Decided Dec. 20, 1977.

1234

Frank G. Pollock, Bloomfield Hills, Mich., Robert L. Schwartz, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for petitioner-appellant.

Michael L. Paup, Scott P. Crampton, Gilbert Andrews, Asst. Attys. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., Jonathan S. Cohen, Stephen M. Gelber, Meade Whitaker, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and GREEN *, District Judge.

* Honorable Ben C. Green, Senior Judge, United States District Court for the Northern District of Ohio, sitting by designation.

PECK, Circuit Judge.

Petitioner-appellant taxpayer perfected this appeal from a judgment of the Tax Court, which held that the taxpayer was liable for income tax deficiencies for the calendar years 1964 and 1965. The full Tax Court reviewed the case, and the judges split six to four, one not participating, in upholding respondent-appellee Commissioner's determination. *Owens v. Commissioner*, 64 T.C. 1 (1975). We affirm the Tax Court's decision as to the year 1965, but reverse as to the year 1964.

I

A detailed statement of facts in the present case is reported in the Tax Court's majority opinion. *Owens v. Commissioner, supra,* 64 T.C. at 2–11. The following is a recital of the salient facts.

In December, 1962, Mid-Western Investment Corporation (Mid-Western) was incorporated. Taxpayer was one of the incorporators and was the sole shareholder.

In October, 1963, Alexander Hamilton Life Insurance Company of America (Alexander Hamilton) was granted a preliminary charter by the State of Michigan's Insurance Department. Entitlement to a final charter was contingent upon the successful funding of the corporation. Taxpayer was again one of the incorporators.

From November, 1963, to April, 1964, Mid-Western underwrote the sale of the common stock of Alexander Hamilton, and Mid-Western earned sales commissions from that effort. Following the very successful sale of Alexander Hamilton stock, in May, 1964, Alexander Hamilton received its final charter. Taxpayer, as chief executive officer of Alexander Hamilton, became extremely busy with the management of that company.

In the fall of 1964, taxpayer went to the Detroit office of Lybrand, Ross Bros. & Montgomery (now Coopers & Lybrand and hereinafter referred to as Lybrand) for accounting, business investment, and tax planning advice. As a result of consultations, taxpayer caused Mid-Western to invest in cattle. In December, 1964, Mid-Western entered into four contracts for the purchase of cattle. In each contract, the seller of the cattle agreed to feed and maintain the livestock, and Mid-Western agreed to purchase feed, the cost of which was governed by a price negotiated by the parties. Pursuant to the four contracts, Mid-Western paid $212,885.00 for feed in 1964 and deducted that amount on its 1964 corporate income tax return. By July, 1965, all of the cattle had been sold, and Mid-Western had realized a net profit on the investment of $9,907.08. During this period of cattle investment, in January, 1965, taxpayer caused Mid-Western to elect Subchapter S status[1] upon the advice of Lybrand.

---

1. Subchapter S status permits small corporations which are essentially partnerships to enjoy the advantages of the corporate form of organization without being made subject to possible tax disadvantages of the corporation. B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders,* 12–1–12–34 (3d ed. 1971). 26 U.S.C. § 1371(a) provides:

> For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—
> (1) have (except as provided in subsection (e)) more than 10 shareholders;
> (2) have as a shareholder a person (other than an estate and other than a trust described in subsection (f)) who is not an individual;
> (3) have a nonresident alien as a shareholder; and

(4) have more than one class of stock. At the risk of oversimplification, a Subchapter S corporation does not pay tax on its income. Rather, the shareholders include the corporation's income in their own. 26 U.S.C. § 1372(a)(b) provides:

> (a) Eligibility—
> Except as provided in subsection (f), any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation—
> (1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or
> (2) on the day on which the election is made, if the election is made after such first day,

In the spring of 1965, Lybrand became aware of two men in Florida, Manuel Rousseau and Enrique Santeiro, who had large net operating losses that they were interested in utilizing. Negotiations with Rousseau and Santeiro were begun for the sale to them of the Mid-Western stock. An agreement was deferred, however, until all the cattle in which Mid-Western had invested were sold. Taxpayer's accountants were concerned that collapsible corporation problems under 26 U.S.C. § 341 might arise if the sale of stock took place before all of the cattle were sold.

On August 20, 1965, over a month after all the cattle were sold by Mid-Western, the stock sale was consummated, and the Tax Court found as a fact that taxpayer agreed to the sale because his accountants recommended the action and because he was busy at Alexander Hamilton. Rousseau and Santeiro paid $262,842.26 for the stock, paid from funds borrowed from the Bank of Nova Scotia. In the sale agreement, Rousseau and Santeiro agreed to continue Mid-Western's Subchapter S election, which they did by filing timely shareholder consents.

On the same day as the sale of stock, however, a check payable to themselves for $299,822.62 was drawn on Mid-Western's checking account by Rousseau and Santeiro. The effect of the check was to reduce the balance in the account to zero. At the time of this withdrawal, the cash in the checking account constituted Mid-Western's only assets. Three days later, on August 23, 1965, Mid-Western adopted a formal resolution of liquidation. On September 7, 1965, Rousseau and Santeiro signed a certificate of dissolution of Mid-Western, which was filed December 23, 1965, with the Michigan Corporation and Securities Commission.

Mid-Western, on its 1965 tax return, reported taxable income of $245,650.31, $140,020.68 having been distributed to Rousseau and $105,629.63 having been distributed to Santeiro. On the 1965 joint tax return of taxpayer and his wife, they reported the sale of Mid-Western stock as resulting in $246,925.00 of long-term capital gain.

In 1969, however, the Commissioner issued two notices of deficiency. In the first, taxpayer and his wife were informed that Mid-Western's 1965 undistributed Subchapter S income of $245,650.31 was taxable to them.[2] In the second, taxpayer was informed that, as transferee of the assets of Mid-Western, he was liable for a $103,601.41 deficiency in Mid-Western's 1964 corporate income tax return.

Taxpayer sought review in the Tax Court, but there the Commissioner's determinations were upheld. Taxpayer now appeals to this Court.

## II

The Tax Court decided that taxpayer did not prove that the August, 1965, transaction involving taxpayer and the two Florida men, Rousseau and Santeiro, was a bona fide sale and hence held that for the year 1965, taxpayer was taxable for Mid-Western's income; if the sale were to be disregarded, taxpayer was left as the sole

consent to such election.

(b) Effect—

If a small business corporation makes an election under subsection (a), then—

(1) with respect to the taxable years of the corporation for which such election is in effect, such corporation shall not be subject to the taxes imposed by this chapter (other than as provided by section 58(d)(2) and by section 1378) and, with respect to such taxable years and all succeeding taxable years, the provisions of section 1377 shall apply to such corporation, and

(2) with respect to the taxable years of a shareholder of such corporation in which or with which the taxable years of the corpora-

tion for which such election is in effect and, the provisions of sections 1373, 1374, and 1375 shall apply to such shareholder, and with respect to such taxable years and all succeeding taxable years, the provisions of section 1376 shall apply to such shareholder.

The remaining provisions of Subchapter S, 26 U.S.C. §§ 1373–78, deal with the details of the taxation of a Subchapter S corporation and shareholder.

2. Taxpayer's wife was included in the deficiency notice only because of the filing of a joint return. Hereinafter, we will refer only to taxpayer as the taxable party on Mid-Western's 1965 income.

shareholder of Mid-Western, a Subchapter S corporation which had undistributed income.[3] *See* 26 U.S.C. § 1373. The Tax Court based this determination on "gaps" in the evidence left by taxpayer as well as on the proofs put into evidence. The Tax Court stated that there was no evidence showing (1) that the advisers for Rousseau and Santeiro during the negotiations for the sale of taxpayer's Mid-Western stock were truly independent, (2) that the Bank of Nova Scotia required collateral for its loan to Rousseau and Santeiro so that they could buy the Mid-Western stock, (3) that the funds withdrawn by Rousseau and Santeiro from Mid-Western's bank account after the sale were put to any use, (4) that the taxpayer had an explanation for his decision to take the "cumbersome" route of selling his stock in order to divest himself of his interest in Mid-Western, rather than the "direct" route of distribution, (5) that Rousseau and Santeiro had any business purpose in acquiring Mid-Western, and (6) that there was a specific time when Rousseau and Santeiro conceived of the plan of liquidation and dissolution of Mid-Western. Consequently, the Tax Court determined that the "sale" was a cover for a distribution by Mid-Western of its assets to taxpayer, with a commission having been paid to Rousseau and Santeiro.

On appeal, taxpayer claims that the Tax Court, with the evidence before it, could not come to any other conclusion than that there was a bona fide sale in August, 1965. Taxpayer insists that the parties negotiated with each other at arm's length and took the necessary steps to transfer the ownership of the stock in a sales transaction. Taxpayer notes that both sides believed that they would profit from the deal. Taxpayer wanted to divest himself of his Mid-Western stock. Rousseau and Santeiro believed that they would gain exclusive control over a corporation and its assets without being taxable for the corporation's income because they intended to apply their net operating losses to offset Mid-Western's

1965 income distributed between them as Subchapter S corporation shareholders.

■ We begin with the principle that a taxpayer, working within the law, may legitimately seek to avoid taxes. "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935).

What the law does not permit a taxpayer to do in seeking to avoid taxes is to cast transactions in forms when there is no economic reality behind the use of the forms. "The incidence of taxation depends upon the substance of a transaction. . . . To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Commissioner of Internal Revenue v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). *See Gregory v. Helvering, supra,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; *Union Planters National Bank v. United States,* 426 F.2d 115, 117 (6th Cir.), *cert. denied,* 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

■ As the Tax Court and the taxpayer correctly analyze, taxpayer's tax liability for the 1965 income of Mid-Western depends upon whether the August, 1965, transfer of taxpayer's Mid-Western stock to Rousseau and Santeiro was in substance a sale or whether that transaction was a diversionary tactic, lacking economic substance, in a distribution of Mid-Western's assets to taxpayer. *See Davant v. C.I.R.,* 366 F.2d 874, 880–82 (5th Cir. 1966), *cert. denied,* 386 U.S. 1022, 87 S.Ct. 1370, 18 L.Ed.2d 460 (1967). The question whether the August, 1965, transaction was in substance a sale or a distribution was a ques-

---

**3.** Mid-Western's current and accumulated earnings and profits were in excess of the amount of undistributed taxable income and hence the full amount of the undistributed income would be taxable to taxpayer. *See* 26 U.S.C. § 1373(c).

tion of fact,[4] see *United States v. Cumberland Public Service Co.,* 338 U.S. 451, 454, 70 S.Ct. 280, 94 L.Ed. 251 (1950), *Commissioner of Internal Revenue v. Court Holding Co., supra,* 324 U.S. at 333–34, 65 S.Ct. 707, *Dobson v. Commissioner of Internal Revenue,* 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943), *Genecov v. United States,* 412 F.2d 556, 561 (5th Cir. 1969), *O'Neill v. Commissioner of Internal Revenue,* 271 F.2d 44, 50 (9th Cir. 1959), *Commissioner of Internal Revenue v. Pope,* 239 F.2d 881, 883 (1st Cir. 1957), and the Tax Court found that it was a distribution. The standard of review in this Court of the Tax Court's finding is established by 26 U.S.C. § 7482(a):

"The United States Court of Appeals shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury . . . ." .

Federal Rule of Civil Procedure 52(a) states that findings of fact shall not be set aside unless clearly erroneous. *See Willett v. Commissioner of Internal Revenue,* 277 F.2d 586, 588 (6th Cir.), *cert. denied,* 364 U.S. 914, 81 S.Ct. 276, 5 L.Ed.2d 226 (1960). We hold that the Tax Court was not clearly erroneous in finding that the August, 1965, transaction involving taxpayer and the two Florida men, Rousseau and Santeiro, did not constitute a bona fide sale but a distribution of Mid-Western's assets.

Taxpayer had the burden of proof in the Tax Court on the question of whether the sale was bona fide. The Commissioner's determination that the taxpayer was to be taxed on Mid-Western's 1965 income was premised on the finding that the sale was not bona fide, and the Commissioner's determination had the support of a presumption of correctness. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

Taxpayer earnestly contends that he carried his burden of proof because he presented uncontradicted evidence showing that the sale of taxpayer's Mid-Western stock to Rousseau and Santeiro was negotiated in an arm's length deal and that the Tax Court was thus clearly erroneous in not accepting his evidence and instead emphasizing "gaps" in the evidence. In fact, the "gap" in the evidence that questioned the independence of Rousseau's and Santeiro's advisers is in direct conflict with taxpayer's proof that there was an arm's length deal.

While it would seem improper for the Tax Court to rely on what was not proven in order to reject taxpayer's inferences from what was put into evidence, the Tax Court had to question how independent advisers for Rousseau and Santeiro could believe that their clients could use net operating losses against the income of a newly acquired, unrelated business. There is not the slightest doubt that net operating losses cannot be used in such a manner, *see Lisbon Shops v. Koehler,* 353 U.S. 382, 77 S.Ct. 990, 1 L.Ed.2d 924 (1957), and without the use of the net operating losses, the sale was of doubtful value to Rousseau and Santeiro. For purposes of this opinion, however, we assume that taxpayer proved that the August, 1965, transaction was an arm's length deal. Taxpayer still did not carry his burden of proving that the sale was bona fide, and most of the "gaps" in evidence related to what taxpayer needed but failed to prove in order to carry his burden of proof.

Because the incidence of taxation depends upon the substance of a transaction and taxpayer had the burden of proving that the sale was bona fide, taxpayer had to prove not only that there was a formal transfer of the Mid-Western stock in a sale negotiated at arm's length by the parties, but also that what he really sold was stock, that the Mid-Western shares transferred truly represented the equity of a business. Normally, stock in a corporation represents an ownership interest in a going business organization; the stockholders do not own the corporation's property. "The corpora-

---

4. By contrast, the question whether a transaction is a sale for the purposes of 26 U.S.C. § 351 is a question of law. *See Six Seam*

*Company, Inc. v. United States,* 524 F.2d 347, 356 (6th Cir. 1975).

tion is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members." *Klein v. Board of Tax Supervisors of Jefferson County, Ky.*, 282 U.S. 19, 24, 51 S.Ct. 15, 16, 75 L.Ed. 140 (1930). When a stockholder sells his stock, he is selling his proprietary interest in a going concern and not an interest in the corporate assets. *See generally* V. Brudney & M. Chirelstein, *Corporate Finance* (1972). Thus, if taxpayer truly sold stock, then he had every right to take a "cumbersome" route of sale in order to divest himself of his interest in Mid-Western, rather than the "direct" route of distribution, and did not need any special explanation, as the Tax Court required, for taking that action. However, the combination of four circumstances in the case negated the possibility that taxpayer sold the equity of a business.

 First, Mid-Western had only cash as an asset, and according to taxpayer's representations in the sale of stock agreement with Rousseau and Santeiro, there were no debts or claims, contingent or otherwise, existing against Mid-Western. As the Tax Court correctly stated, "When one purports to sell cash in corporate solution the burden is surely particularly severe on the seller to show that the only purpose served is not tax avoidance." *Owens v. Commissioner, supra*, 64 T.C. at 15, *quoting John D. Gray v. Commissioner*, 56 T.C. 1032, 1069 (1971), *aff'd on other grounds*, 561 F.2d 753 (9th Cir. 1977). The reason for such a heavy burden when the corporation owns just cash is that the corporation has already been effectively liquidated from a corporate law viewpoint, and such a liquidation is a step in the process of winding up a corporation's affairs. Once all the liabilities have been paid, as they had been in the present case, the cash is available for distribution to the stockholders. *See* D. Herwitz, *Business Planning*, 613–29 (1966).

Second, Mid-Western carried on no business activity and thus was a lifeless shell at the time of the purported sale of stock. According to the Tax Court,

"[t]he record reflects no evidence to show that Mid-Western was a viable corporate entity at any time subsequent to July 12, 1965, the date on which the last sale of cattle apparently took place. It had ceased all activities by that time. . . . Any business reasons Santeiro and Rousseau may have had for purchasing Mid-Western is something about which we are merely left to guess. In hindsight, it seems clear that they had none." 64 T.C. at 15.

In *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 438–39, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499 (1943), the Supreme Court stated:

[t]he doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

If Mid-Western had no business at the time of the purported sale of the stock, then there is no basis for recognizing Mid-Western as a separate entity under the tax laws. *See O'Neill v. Commissioner of Internal Revenue*, 271 F.2d 44, 49 (9th Cir. 1959); *Paymer v. Commissioner of Internal Revenue*, 150 F.2d 334 (2d Cir. 1945); B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders*, 1–14—1–17 (3d ed. 1971). A corporation that is not carrying on business activity can be a ready vehicle for use as "nothing more than a contrivance" in a scheme of illegitimate tax avoidance. *Gregory v. Helvering, supra*, 293 U.S. at 469, 55 S.Ct. 266.

Third, taxpayer was the sole shareholder of Mid-Western and thus was in exclusive control of the corporation. When taxpayer formally conveyed his stock to Rousseau and Santeiro, he was also transferring the ability to dispose of the corporate assets.

Fourth, in order to pay the loan that Rousseau and Santeiro arranged with the Bank of Nova Scotia, they had two alternatives. First, they could have withdrawn the cash from the bank account, thereby reducing Mid-Western to an empty corporate shell, and pay the loan immediately. Second, they could have earned profit with Mid-Western's business, and paid the loan over a period of time. The risks of such a business would have led the Bank of Nova Scotia to require collateral, but, as the Tax Court noted, the record does not reveal that collateral was required. 64 T.C. at 13. Instead, the evidence shows that Rousseau and Santeiro withdrew all the cash from the Mid-Western bank account the same day as the purported sale of stock.

In view of these circumstances of the sale, we cannot say that the Tax Court erred in finding that taxpayer failed to prove that he sold stock; Rousseau and Santeiro did not assume the risks of a business. What taxpayer actually sold to Rousseau and Santeiro was the right to distribute a quantity of cash to themselves. Moreover, that right to a distribution of cash was in substance no different than the cash that taxpayer received for the stock. Exclusive control of Mid-Western was transferred to Rousseau and Santeiro. There were no obstacles to the immediate withdrawal of the cash in Mid-Western's bank account. Rousseau and Santeiro were given the right to draw on the Mid-Western bank account in return for taxpayer being given the right to draw on Rousseau's and Santeiro's bank account. The parties were simply exchanging cash.

Under *Gregory v. Helvering, supra,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, tax liabilities cannot be altered on the basis of parties exchanging the most fungible commodity of all, cash. Judge Learned Hand expressed succinctly this aspect of *Gregory*:

"The Income Tax imposes liabilities upon taxpayers based upon their financial transactions, and it is of course true that the payment of the tax is itself a financial transaction. If, however, the taxpay-

er enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; for *we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose.*" (Emphasis supplied.)

*Gilbert v. Commissioner of Internal Revenue,* 248 F.2d 399, 410, 411 (2d Cir. 1957) (Hand, J., dissenting). *See Knetsch v. United States,* 364 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); *Waterman Steamship Corporation v. Commissioner of Internal Revenue,* 430 F.2d 1185, 1193 (5th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971); *Goldstein v. Commissioner of Internal Revenue,* 364 F.2d 734 (2d Cir. 1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967). An exchange of cash does not affect a taxpayer's beneficial interest, and in the present case it would serve no other purpose than tax avoidance. *See Haberman Farms, Inc. v. United States,* 305 F.2d 787 (8th Cir. 1962); B. Bittker & J. Eustice, *supra,* 14–99.

The Tax Court properly found the August, 1965, transaction was a distribution of Mid-Western's cash to taxpayer, with Rousseau and Santeiro acting as conduits, receiving a $36,979.56 commission (the difference between the stock price and the amount of cash in Mid-Western's bank account) for their function. The transfers of cash could not constitute a sale of stock. "A given result at the end of a straight path is not made a different result because reached by following a devious path." *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 395, 82 L.Ed. 474 (1938).

A case that also presented the problem of a buyer purchasing a corporation whose only asset was cash and which is consistent with our conclusion is *Lowndes v. United States,* 384 F.2d 635 (4th Cir. 1967). There a steel corporation sold all of the outstanding stock of four subsidiary corporations whose only assets were interest bearing certificates. The taxpayer, Mrs. Lowndes, was the purchaser, and she financed the pur-

chase by pledging the stock. Six months after the purchase of the stock, Mrs. Lowndes caused her corporations to have the assets distributed. She reported the gain as long-term capital gain. As we have done in the present case, the Fourth Circuit assumed for the purposes of decision that the purported sale of stock was an arm's length transaction. The Fourth Circuit upheld the district court's findings that the corporate entities of the subsidiary corporations should be disregarded since investment of corporate funds in interest bearing time deposit certificates was not a business purpose under *Moline Properties, Inc. v. Commissioner of Internal Revenue, supra,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, and that the sale transaction was thus nothing more than a purchase of cash and not the sale of stock of a risky, corporate enterprise.

It is in this respect that the cases upon which taxpayer relies, *W. P. Hobby v. Commissioner,* 2 T.C. 980 (1943), and *Clara M. Tully Trust v. Commissioner,* 1 T.C. 611 (1943), are inapposite to the present case. In those two cases, the shareholders, who were not in control of their corporations, sold stock in going businesses.

In *W. P. Hobby* a preferred shareholder sold stock that was soon to be redeemed by the corporation, an event which the shareholder anticipated. That taxpayer was taxed on the sale at long-term capital gains rates, and the Commissioner's position that the shareholder received a short-term liquidation gain in redemption of his shares, which was premised on determining the sales of stock to be without substance, was rejected. *But compare Jones v. United States,* 531 F.2d 1343 (6th Cir. 1976). Although *W. P. Hobby* is similar to the present case because the purchaser of the stock received cash shortly after the sale, the corporation in *W. P. Hobby* was a going concern over which the purchaser had no control. For the short period of time that the purchaser owned the preferred stock, he had an ownership interest in a risky enterprise and had no guarantee that he would have his stock redeemed.

In *Tully Trust,* some of the second preferred shareholders of a corporation sold their stock to an outside third party, who in turn sold the stock at a higher price to the corporation. Because the Tax Court found that the sale of stock by these shareholders to the outside third party was bona fide, unrestricted, and not part of any larger scheme, the two sales were recognized as separate, independent transactions. *Tully Trust* is not like the present case because the sellers sold stock that represented an interest in a going concern, not a right to cash.

Taxpayer insists, however, that the sale of stock was deferred until there was just cash in Mid-Western because of potential collapsible corporation problems that would result if he sold stock while he owned the cattle. If taxpayer sold his stock and Mid-Western was determined to be a collapsible corporation, taxpayer would lose capital gains treatment of the sale of stock, which was important due to the great increase in value of the Mid-Western stock.[5]

We do not doubt that the problem was real. The collapsible corporation section was enacted to cover corporations which are used to give the appearance of a long-term investment to what in reality is a mere venture or project, with the view of making the gains which would otherwise constitute

---

5. 26 U.S.C. § 341(a) provides:
 (a) **Treatment of gain to shareholders.**—Gain from—
 (1) the sale or exchange of stock of a collapsible corporation,
 (2) a distribution in partial or complete liquidation of a collapsible corporation, which distribution is treated under this part as in part or full payment in exchange for stock, and
 (3) a distribution made by a collapsible corporation which, under section

301(c)(3)(A), is treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property,
to the extent that it would be considered (but for the provisions of this section) as gain from the sale or exchange of a capital asset held for more than 6 months shall, except as otherwise provided in this section, be considered as gain from the sale or exchange of property which is not a capital asset.

ordinary income, taxable as long-term capital gain. A collapsible corporation is defined in 26 U.S.C. § 341 to include a corporation that is used solely to purchase livestock, where a sale by a sole shareholder of the stock is contemplated and is consummated before a substantial part of the taxable income is derived from the livestock, resulting in gain to the shareholder in the value of the stock attributable to the soon to be realized income from the sale of livestock.[6] Mid-Western would thus have been determined a collapsible corporation if tax-payer had sold his stock before a substantial part of the income from the cattle had been earned. Although it was not necessary to wait until all the cattle were sold to avoid the collapsible corporation section's application, *see Commissioner of Internal Revenue v. Kelly*, 293 F.2d 904 (5th Cir. 1961), a rebuttable presumption is established by 26 U.S.C. § 341(c), which would have required Mid-Western to sell all the cattle to avoid being determined a collapsible corporation.[7] The decision to wait until all the cattle were sold insured avoidance.

---

**6.** 26 U.S.C. § 341(b)(1) provides:

**(b) Definitions.—**

**(1) Collapsible corporation.**—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

26 U.S.C. § 341(b)(3) provides:

**(3) Section 341 assets.**—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—

. . .

(D) property described in section 1231(b) (without regard to any holding period therein provided), except such property which is or has been used in connection with the manufacture, construction, production, or sale of property described in subparagraph (A) or (B).

In determining whether the 3-year holding period specified in this paragraph has been satisfied, section 1223 shall apply, but no such period shall be deemed to begin before the completion of the manufacture, construction, production, or purchase.

26 U.S.C. § 1231(b)(1)(3) provides:

**(1) General rule.**—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or

(C) a copyright, a literary, musical, or artistic composition, or similar property, held by a taxpayer described in paragraph (3) of section 1221.

**(3) Livestock.**—Such term also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes, and held by him for 12 months or more from the date of acquisition. Such term does not include poultry.

**7.** 26 U.S.C. § 341(c) provides:

**(1) In general.**—For purposes of this section, a corporation shall, unless shown to the contrary, be deemed to be a collapsible corporation if (at the time of the sale or exchange, or the distribution, described in subsection (a)) the fair market value of its section 341 assets (as defined in subsection (b)(3)) is—

(A) 50 percent or more of the fair market value of its total assets, and

(B) 120 percent or more of the adjusted basis of such section 341 assets.

Absence of the conditions described in subparagraphs (A) and (B) shall not give rise to a presumption that the corporation was not a collapsible corporation.

**(2) Determination of total assets.**—In determining the fair market value of the total assets of a corporation for purposes of paragraph (1)(A), there shall not be taken into account—

(A) cash,

(B) obligations which are capital assets in the hands of the corporation (and governmental obligations described in section 1221(5)), and

(C) stock in any other corporation.

Taxpayer's action to avoid collapsible corporation problems does not, however, affect our determination that the sale of stock was not bona fide. Taxpayer did face a trade-off of risks on a "damned if you do, damned if you don't" basis. If he owned cattle at the time of the stock sale, he faced the risk that the Commissioner would determine that Mid-Western was a collapsible corporation; if he did not own cattle at the time of such sale, he faced the risk that the Commissioner would determine that Mid-Western was not a viable corporate entity and that there was thus no bona fide sale. By insuring avoidance of collapsible corporation problems, taxpayer left Mid-Western a corporate shell with cash and without business and thereby insured having the problem of establishing that there was a bona fide sale. It was a situation of taxpayer's own making. Taxpayer chose to conduct a cattle investment program through an otherwise dormant corporation and to have that corporation elect Subchapter S status, and taxpayer made those decisions on the advice of sophisticated investors.

### III

The Tax Court also decided that not all of the $212,885.00 cattle feed expense paid by Mid-Western to the feeding companies in December, 1964, was properly deducted on Mid-Western's 1964 tax return and that for the year 1964, taxpayer, as transferee of Mid-Western's assets, was held liable for the deficiency in Mid-Western's income tax return resulting from the amount of the deduction disallowed.[8] The Tax Court determined that Mid-Western had used most of the feed in 1965 and hence had not purchased the feed in 1964, but in that year had only placed deposits, which were not immediately deductible.

On appeal, taxpayer claims that the feed payments in 1964 were purchases and not deposits and that he was thus entitled to the deduction in 1964. We agree with taxpayer.

There is no question that the purchase of feed for the cattle was a deductible ordinary and necessary business expense under 26 U.S.C. § 162(a). *See Welch v. Helvering, supra,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. The problem is determining when the deduction should be taken. *See Mann v. Commissioner of Internal Revenue,* 483 F.2d 673 (8th Cir. 1973).

According to 26 U.S.C. § 461(a), "[t]he amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Mid-Western used the cash receipts and disbursements method of accounting, and the applicable Treasury Regulation provides in pertinent part that "[e]xpenditures are to be deducted for the taxable year in which actually made." § 1.446(c)(1)(i). The issue, then, is whether Mid-Western was irretrievably out-of-pocket the amount paid for feed when the feed payments were made in 1964? *Cravens v. Commissioner of Internal Revenue,* 272 F.2d 895 (10th Cir. 1959); *John Ernst v. Commissioner,* 32 T.C. 181 (1959).

The Tax Court stated that the key to the resolution of this issue of the deductibility of feed expense was "refundability." 64 T.C. at 17. If taxpayer's feed payment was refundable to him, then an immediate deduction for the payment could not be taken since taxpayer had only placed deposits with the feeder companies and had not actually purchased feed. The Tax Court based this approach to the problem before us on Eighth Circuit precedent, *Mann v. Commissioner of Internal Revenue, supra,* 483 F.2d 673.

We agree with the Tax Court that the refundability of the feed payments is an important factor in determining whether a purchase or a deposit has been made, but

---

**8.** Mid-Western deducted $212,885.00, of which the Commissioner allowed $12,816.22, an amount which the Commissioner calculated to be the cost of the feed consumed in 1964. The parties agree that if the Commissioner were to be upheld, the amount of the deduction disallowed in 1964 must be allowed in 1965.

reject the Tax Court's conclusion that Mid-Western's 1964 feed payments were refundable.

The Tax Court examined three aspects of the feeder contracts to support its conclusion that the feed payments were refundable. First, the Tax Court noted that "[n]either the type of the feed nor the amount of each type of feed was specified." 64 T.C. at 17. Why this fact is relevant to a determination of refundability is not clear from the Tax Court's opinion. The Tax Court simply states that it "seems" like such lack of specificity would be relevant, citing *Estate of Frank Cohen*, T.C. Memo. 1970–272, 39 P–H T.C. Memorandum Decisions 1331 (1970). The Commissioner's explanation of the Tax Court's decision is that Mid-Western and the feeder companies never actually committed themselves with respect to the quality, quantity, or price of any particular feed and that the contracts thereby lacked sufficient specificity to constitute a present purchase of feed.

Contrary to the representations of the Commissioner, Mid-Western entered into binding commitments to buy feed. Each of the contracts committed Mid-Western to a price for the feed, which was based on (1) the availability of feed for the particular geographical area of the country—the feeder companies were located in Arizona, California, Nebraska, and Ohio—and (2) the type and size of the animal. Each of the contracts committed the feeder to attain a prescribed level of weight gain in the cattle, and Mid-Western purchased the needed quantity of feed calculated to attain a prescribed level of weight gain. Instead of the total cost of the feed being based on a quantity of a type of feed, the total cost was computed on a feed price per animal times the number of animals purchased. That the feeder companies were entrusted with the type of feed to give the cattle does not detract from the binding character of the contracts. Parenthetically, we observe that the record is devoid of any suggestion that taxpayer was qualified to express an opinion in this area.

Second, the Tax Court noted that certain financial "adjustments were to be made between the parties to the contracts depending upon the weight gain achieved." 64 T.C. at 18. The contracts stipulated that if the prescribed level of weight gain was exceeded, the feeder was entitled to receive a bonus from Mid-Western, but that if the prescribed level of weight gain was not obtained, then Mid-Western was entitled to a penalty payment from the feeder company. The Tax Court determined that the bonus and penalty provision intended a quantitative adjustment in the feed payment depending upon future events.

According to the testimony at the Tax Court, however, the bonus and penalty provision was designed to protect Mid-Western from misuse of the feed and to provide an incentive to the feeder companies to perform well their tasks of fattening the calves. There is no question but that such financial arrangements would properly function as a carrot and stick to the feeder companies.

Of course, the intended operation of the bonus and penalty provision does not preclude that provision from having as an additional purpose the adjustment of the feed payment. However, it would only be in cases of penalties for failure by the feeder companies to have the cattle attain a prescribed weight gain that there would be potential refunds on the feed payments. The underlying assumption of the Tax Court's opinion in analyzing such penalties to be refunds must be that the failure to attain the desired weight gain was due to the failure of the cattle to eat the amount of feed that was calculated to be necessary to attain the prescribed weight gain. The problem with that assumption is that it is pure speculation on the part of the Tax Court, speculation that excludes other factors than feed consumed (such as the health of the cattle or extremes of weather) as the basis for the actual (as opposed to the calculated) weight gain of the cattle. Moreover, even if the Tax Court's assumption were true, the feeder companies were not at the risk of the market with the unused feed, as the Tax Court indicated, because the con-

tracts provided that the bonus and penalty payments were to be made at the contract price for feed; the feeder companies would simply be repurchasing unused feed.

Third, the Tax Court noted that the contracts guaranteed that Mid-Western's net loss would not exceed $5 per head of cattle. The Tax Court calculated that since Mid-Western owned 2,199 head of cattle, it could not have been out-of-pocket more than $10,995.00 for feed out of the $212,885.00 original payment. The net loss limitation, however, was designed to protect Mid-Western against a drastic drop in cattle prices, a risk against which Mid-Western was wise to seek insurance. A floor was placed on how much Mid-Western could lose in the investment, thereby enhancing the attractiveness of an investment requiring a substantial outlay of cash.

While the intended operation of the net loss limitation does not preclude that provision from having the additional purpose of refunding to Mid-Western money not used by the feeder companies for feed, we find that Tax Court's reasoning as to this provision in the contracts to be especially tenuous. The underlying assumption of the Tax Court's opinion in analyzing the net loss limitation to allow for a refund on the feed payment is that a net loss would be the result of feed going unused. The assumption is not warranted. The Tax Court is attempting to use a total profit or loss figure, which is the difference between an operation's income and expenses, as a proxy for one item of expense. The fact is that refunds that the feeder companies would pay as a consequence of Mid-Western's net operating loss exceeding $5 per head of cattle would be due to a large drop in cattle prices, not to feed going unused, and cattle prices would be determined by the consumer preference for beef, not just the quality of the cattle.

We thus must conclude that in the present case the three provisions which the Tax Court determined to be contractual arrangements for refunds on the original feed payment do not operate in the manner that the Tax Court proposes. Rather, the feeder contracts committed Mid-Western to the purchase of feed in 1964. The parties agreed and adhered to a fixed price for the feed, unlike the situation in *Lillie v. Commissioner*, 45 T.C. 54 (1965), *aff'd per curiam*, 370 F.2d 562 (9th Cir. 1966), in which a taxpayer was charged the current market price throughout the feeding period, not a predetermined price, and the immediate deduction was disallowed. The contracts also provided that the feed payment was to be refunded only in cases of death, bankruptcy, or insolvency of the feeder. Moreover, there were sound business reasons for the advance payments, as in *Cravens v. Commissioner, supra*, 272 F.2d 895, which held that such a prepayment was a purchase and hence immediately deductible, and unlike the situations in *Shippy v. United States*, 308 F.2d 743 (8th Cir. 1962), *aff'g* 199 F.Supp. 842 (W.D.S.D.1961), and *Lillie v. Commissioner, supra*. Mid-Western guaranteed a fixed price for the feed and the availability of feed for the duration of the feeding periods agreed upon in the contracts.

The Commissioner contends that even if the feed payments are determined to be purchases, the deduction in 1964 should not be allowed. The Commissioner offers an interpretation of 26 U.S.C. § 446(b) that would enable him to allocate a portion of Mid-Western's feed expenses in 1964 to 1965 on the ground that such allocation will permit a more accurate reflection of income. Section 446(b) provides:

"If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

This section gives the Commissioner the power only to change the taxpayer's method of accounting. The Commissioner, however, points to a Treasury Regulation interpreting § 446 as the basis of his power to order a taxpayer to defer reporting a deduction. That regulation, § 1.446(a)(1), provides in pertinent part:

**1246**

"The term 'method of accounting' includes not only. the overall method of accounting of the taxpayer but also the accounting treatment of any item."

■ The problem with the Commissioner's argument is that under Regulation § 1.446(a)(1), the Commissioner is required to choose some other method of accounting that would more accurately reflect income, and in the present case it is not apparent that any other method of accounting would lead to a different result than the cash receipts and disbursements method of handling the feed expense deduction. It would not be different with the accrual method. Treasury Regulation § 1.446(c)(1)(ii) provides that under the accrual method, "deductions are allowable for the taxable year in which all the events have occurred which establish the fact of liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy." With the feed expense in 1964, all the events which establish the fact of liability for the payments had occurred in December, 1964. Although the Commissioner contends that *Peoples Bank and Trust Company v. Commissioner of Internal Revenue*, 415 F.2d 1341 (7th Cir. 1969), is authority for his position, in that case an interest expense was disallowed because "all events which would fix the amount of interest to be paid ha[d] not occurred." 415 F.2d at 1344. We hold that Mid-Western was entitled to the full deduction in 1964 for the feed payments.

The Tax Court decision is affirmed as to the year 1965, but reversed as to the year 1964. Each party is to pay his own costs.