**HABERMAN FARMS, INC., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**George HABERMAN and Fannie H.**
**Haberman, Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**Rex HABERMAN and Phyllis Haberman,**
**Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

Nos. 16760–16762.

United States Court of Appeals
Eighth Circuit.

July 16, 1962.

6. E. g., Parham v. Dove, 8 Cir., 271 F. 2d 132 (1959); Carson v. Warlick, 4 Cir., 238 F.2d 724, cert. denied, 353 U.S. 910, 77 S.Ct. 665, 1 L.Ed.2d 664 (1956).

Flavel A. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, and Flavel A. Wright, Lincoln, Neb., for appellants.

Harold C. Wilkenfeld, Tax Division, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson, Harry Baum, Norman H. Wolfe, Attorneys, Dept. of Justice, Washington, D. C., Theodore Richling, U. S. Atty., Omaha, Neb., and Bernard Sprague, Asst. U. S. Atty., on the brief, for appellee.

Before VOGEL, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

These three cases, consolidated for trial, concern the propriety of the Internal Revenue Service's allocation of income of a corporation to the plaintiff taxpayers. The resulting income tax deficiencies were paid. By these actions the taxpayers now seek to recover those payments.

The individuals involved in the controversy are George Haberman, his son Rex, their respective wives who filed joint returns with them, and George's son Hubert. The corporations concerned are Haberman Farms, Inc. ("Farms") and Haberman Industries, Inc. ("Industries"). Hubert and his wife own all the stock of Farms in equal shares. George, Rex and Hubert own all the stock of Industries in equal shares. It is the net income received by Industries during its fiscal years ended September 30 of 1952, 1953 and 1954 from property leased or transferred to it by Farms, George and his wife, and Rex and his wife, respectively, which is in issue and which, for income tax purposes, was allocated back to those taxpayers. The allocation produced no tax change for Industries because its returns for the three years,

both as filed and as adjusted on audit, showed no tax; this was due to Industries' assertion, under § 122(b) (2) (B) of the 1939 Code, 26 U.S.C.A. § 122(b) (2) (B), of a net operating loss carry over from fiscal 1951 arising out of manufacturing operations. The allocation did, however, produce the additional taxes in question for George and Rex and their wives for their taxable calendar years 1952, 1953 and 1954 and for Farms for its taxable fiscal years ending September 30 of 1952, 1953 and 1954.

The cases were tried to the court. Judgment in each was rendered for the United States. The trial court's findings and conclusions are reported at 182 F. Supp. 829. The taxpayers have appealed.

The government's position here is that this income received by Industries was in reality the income of the taxpayers; that Industries was employed only as a device for tax avoidance, that it possessed no legitimate business purpose during the years in question, and that, as an alternative ground, the allocation was properly made under § 45 of the 1939 Code, 26 U.S.C.A. § 45.* The taxpayers' position is that business purpose is not the determinative test for income allocation; that the true test is that of economic effect upon the taxpayers themselves; that, in any event, there were genuine and valid business purposes in Industries' operation and status; and that the allocation is not to be supported under § 45.

The background facts are set forth in detail in the trial court's findings at pp. 830–831 of 182 F.Supp. and need not all be repeated here. We mention only the following as of particular importance:

1. Industries, incorporated in Nebraska in June 1950, was originally concerned with the manufacture of an insect spray device. Its initial operations were ex-

* "In any case of two or more organizations, trades, or businesses (whether or not incorporated * * *) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses."

tensive and genuine. For a while Rex devoted his full time to the corporation. The device, however, proved defective and its production was discontinued in 1951. By September 30 of that year Industries' assets aggregated only $5,-415.21 and it had built up a deficit of almost $75,000. The book liabilities creating this deficit consisted of $62,200 in advances made by the taxpayers, their capital stock investment of $18,000, and a small bank overdraft. To the extent of the advances Industries was indebted to the taxpayers.

2. Discussions took place about that time between the Habermans, their lawyer and their accountant as to what should be done with the corporation, as to the various income tax aspects of the entire situation, and as to the possibility of breathing new life into the corporation and making it solvent.

3. As a result of these meetings, the following steps were taken:

(a) In October 1951, January 1952, and March 1952, respectively, Farms, George and his wife, and Rex and his wife executed with Industries formal leases of farm lands in Nebraska and Colorado for 5-year terms. Industries agreed to maintain all improvements. Except for one of George's farms on which machinery was located, the rental specified in each lease was the same. There was testimony that the parties considered this to be a reasonable rental.

(b) In October 1951, when Farms' lease was executed, Farms, by formal bill of sale, sold Industries grain, hay, an interest in growing wheat, and an interest in a farm partnership. The stated consideration was approximately $7,300 but no cash was paid. At the same time Hubert, also by bill of sale, sold Industries wheat on one of the properties Farms had leased. The consideration for this was $900.

(c) In January 1952, when George's lease was executed, he and his wife, by bill of sale, sold Industries wheat and standing grain on some of the properties they leased. The consideration was in excess of $13,000.

(d) In March 1952, when Rex's lease was executed, he and his wife, by bill of sale, sold Industries grains, hay, and an interest in growing wheat. The consideration was in excess of $3,500.

(e) In October 1951 Farms, by unrecorded warranty deed delivered to Industries' attorney-director, conveyed to Industries for approximately $17,000 certain real estate in Hastings, Nebraska, improved with a cold storage house. Rex testified that this deed was not recorded "because of some liabilities and one thing and another".

(f) In March and April 1952 three separate checking accounts were opened in Industries' name in a Hastings, Nebraska, bank. These were designated as Farm No. 1, Farm No. 2 and Farm No. 3 accounts and were under the respective "direction and management", as Rex testified, of George, Hubert and Rex.. Receipts from the farms leased from George and his wife flowed into Account No. 1; those from the properties leased from Farms and the rent from the cold storage building flowed into Account No. 2; and those from farms leased from Rex and his wife flowed into Account No. 3. Although these accounts were all in Industries' name, it was so arranged, at least, that George could effect withdrawals from Account No. 1, that Hubert and his wife could effect withdrawals from Account No. 2, and that Rex could effect withdrawals from Account No. 3. These withdrawal powers were not limited to amounts equal to the rentals specified in the respective leases. Withdrawals in excess of those rental amounts in fact were made. The corporation's book account for each taxpayer reflected these withdraw-

als, the rentals, the expenses attributable to the property, and the amount for which Industries was indebted to the taxpayer. The indebtedness included both the pre-October 1951 advances and the stated considerations, for which no cash was paid, for the properties transferred or conveyed to Industries.

4. Industries collected the rentals from the leased and conveyed properties. Except for wages paid to hands hired for such custom farming as was performed, the corporation paid no salaries after the end of its fiscal year 1951.

5. Industries' own books were kept separate from those of the respective taxpayers and from those of Hubert and his wife.

6. Following the execution of the leases and the property sales and conveyance, George, Rex and Hubert met at least once a month to discuss operations. They, as stated, were the sole stockholders of Industries and were officers of the corporation. In general, the management of the properties was continued in the same manner after the leases and transfers as before.

7. In 1953, 135 acres of the Nebraska land which George had leased to Industries were sold at auction for about $16,000. The warranty deed from George and his wife for this acreage made no reference to the lease to Industries. It reserved to the grantors an undivided interest in growing wheat. Several persons had expressed interest in this land and George and his sons had discussed the possibility of its sale. George did not recall whether he told the purchaser that the land was under lease to Industries. He testified:

"* * * I don't know how—why I should tell him that because when he bought the land Haberman Industries wouldn't have anything to do with it. I didn't tell him that the —I don't recall. I could have told him that the land was leased to Haberman Industries."

The amount received from this sale was evidently employed in connection with an irrigation system on a school section among the lands leased by George and his wife to Industries. The corporation's rental under the lease from George was thereafter reduced to the extent of the acreage sold. There was no evidence introduced as to any written release of this land by Industries or as to any other formal approval of the transaction on the corporation's part.

8. In February 1958 Industries purchased other Nebraska farm land for $37,500.

We thus have the situation where (a) a corporation possessed a substantial deficit which had been built up by losses from a then abandoned manufacturing operation; (b) the corporation's stockholders were its creditors; (c) the stockholders transferred and leased income-producing assets to it; (d) the stockholders thereafter continued to manage and control the leased and transferred properties; and (e) the stockholders had withdrawal powers over the corporation's bank accounts arranged in accord with the ownership or prior ownership of the income producing assets so transferred.

The taxpayers, of course, have the burden of proof. Industrial Aggregate Co. v. United States, 8 Cir., 1960, 284 F.2d 639, 644.

Gross income is broadly defined by § 22(a) of the 1939 Code and by § 61(a) of the 1954 Code, 26 U.S.C.A. § 22(a) and § 61(a). These and their corresponding predecessor statutes have been said to indicate the purpose of Congress to use "the full measure of its taxing power." Helvering v. Clifford, 1940, 309 U.S. 331, 334, 60 S.Ct. 554, 84 L.Ed. 788; Commissioner of Internal Revenue v. Glenshaw Glass Co., 1955, 348 U.S. 426, 429–430, 75 S.Ct. 473, 99 L.Ed. 483; James v. United States, 1961, 366 U.S. 213, 219, 248, 81 S.Ct. 1052, 6 L. Ed.2d 246; Schoenberg v. Commissioner, 8 Cir., 1962, 302 F.2d 416, 418.

The respective briefs call our attention to such landmark cases as (a) Gregory v. Helvering, 1935, 293 U.S. 465, 469–470, 55 S.Ct. 266, 79 L.Ed. 596, with, on the one hand, its emphasis on the "legal right of a taxpayer to decrease the amount" of his tax and the frequent insignificance of tax reduction motive and, on the other hand, its holding that what was done by that taxpayer "was nothing more than a contrivance to the end" and "an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else"; (b) Higgins v. Smith, 1940, 308 U.S. 473, 477–478, 60 S.Ct. 355, 84 L.Ed. 406, with its statement that the government "may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute"; (c) Knetsch v. United States, 1960, 364 U.S. 361, 365, 367, 81 S.Ct. 132, 5 L.Ed.2d 128, with its approval of language in Gregory that "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended", and that "To hold otherwise would be to exalt artifice above reality"; and (d) a number of other cases, including two of our own (Adams Bros. Co. v. Commissioner, 8 Cir., 1955, 222 F.2d 501, and Survaunt v. Commissioner, 8 Cir., 1947, 162 F.2d 753) where form and tax reduction motive in the particular situation presented were given effect and tax recognition.

We are content, for purposes of the present cases, to do what the taxpayers urge, namely, to consider whether the challenged transactions did not appreciably affect each taxpayer's "beneficial interest except to reduce his tax", as the Supreme Court perhaps suggests in Knetsch, supra, p. 366 of 364 U.S., p. 135 of 81 S.Ct., by its reference to Judge Learned Hand's dissent in Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, 411, and to regard the significance of Gregory, Higgins, and related cases, to be, as the Second Circuit said in Kraft Foods Co. v. Commissioner, 1956, 232 F. 2d 118, 128:

"We do not think that these cases hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence. The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact."

and as this court said in the Adams case, supra, pp. 505 and 507 of 222 F.2d:

"For, as has been so frequently held, the real nature of the transaction will control. * * * And when a sham or device is resorted to for the purpose of distorting the true situation the resulting smoke screen will be pierced to ascertain the truth. Those principles have become academic. * * *

"It should now be clear that transactions will be viewed realistically for tax purposes and treated as what they actually amount to."

See, also, Judge Hand's pertinent comments in National Investors Corporation v. Hoey, 2 Cir., 1944, 144 F.2d 466, 468.

In determining "the real nature" of Industries' function after September 1951, in viewing the situation "realistically for tax purposes", and in ascertaining whether we have basic reality or "a sham or masquerade", we deem it proper, as the taxpayers have done in their brief, to examine the reasons stated as to why they took steps now challenged by the government. Accepting the testimony of the Habermans, they did all this in order (1) to achieve a fair rental for the land which "would pay it out"; (2) to achieve "a fixed income for my family", rather than a variable one, as Rex testified; (3) in George's case, to relieve his wife, in the event of his death, of the details of farm operation; (4) to

get Industries "back on its feet and make it a going proposition" and "to keep it solvent", and (5) to achieve "some tax savings that might result".

Certainly, the first four of these asserted reasons express proper and understandable purposes which are capable of resting in reality as contrasted with sham. But an analysis of these asserted reasons in the light of the facts leaves us with the distinct impression that in actuality the reasons are thin and tenuous and that the only substantive one among them is the tax motivation. Exactly the same results could have been achieved with the employment of a new corporate form, other than Industries, with the same stockholders. And Hubert and his wife already had their own corporation. The first three reasons, moreover, have no special application to Industries; they would have equal application to a similar arrangement with any responsible corporate lessee; they would, inescapably, have greater validity and greater assurance and expectations with a lessee having a sounder financial character than was then possessed by Industries. The fact, stressed in the testimony, that Industries, in its situation, was able to pay the rental obligations proves by itself nothing more than that the transferor-stockholders would have received the same or even greater return without the interposition of Industries. The ability of the Habermans indiscriminately to withdraw from the corporation's bank accounts sums in excess of rental income operates in the direction of lessening the assurance of continually available fixed income. Here was a ready-made corporation in the taxpayers' hands, originally created for an unquestionable legitimate business purpose, but possessed of substantial and as yet not fully tax-enjoyed operating losses. Its rescue and thus profitable possibilities and the magnetic attractiveness of its usefulness as a conduit of income from assets and farming activities already in the family group and already proved sound would at once be attractive to persons with business acumen.

We, as was the trial court, are impressed by (a) the closeness and similarity of the family interests here; (b) the equality of ownership of Industries among George, Rex and Hubert; (c) the identity of Farms with Hubert and his wife; (d) the taxpayers' ownership of Industries' indebtedness; (e) the desire of the taxpayers to do something about getting the corporation back on its feet; (f) the above mentioned appeal of Industries' incompletely enjoyed and available net loss carry over; (g) the comparatively small tax benefit realizable from that carry over unless something were done about the corporation; (h) the identity, with the exception noted, of the farm rental rates even though the properties were in separated areas of Nebraska and in Colorado and even though there was substantial difference in value and productivity because of irrigation; (i) the personalized and allocated management of the three bank accounts of the corporation; (j) the flow of income into those accounts according to the identity of the original taxpayer-transferor or lessor; (k) the ability of the respective individual taxpayers and Hubert and his wife directly to effect withdrawals from those accounts; (l) the fact of withdrawals in excess of the rentals; (m) the failure to record the deed from Farms to Industries; (n) George's sale of acreage under his lease without formal approval of Industries; (o) his and his wife's retention of an interest in the growing wheat on the land at the time of that sale; (p) his grazing of cattle on other lands leased to Industries without compensation to the corporation; (q) his indiscriminate sale of machinery from the farm which had the higher rental attributed to the very presence of that machinery; (r) Hubert's representation on his personal credit application, signed in May 1955, that the cold storage building was among his assets although "incorporated but all stock is owned by H. L. Haberman"; (s) Hubert's representation on another similar credit application, signed in 1951 or 1952, that he was "Offered $38,000

this year" for the same building which he, through Farms, was willing in 1952 to turn over to Industries on questionable credit for $17,000; (t) Hubert's arrangement with his farm manager for the rental on lands leased by Farms to flow into Farm Account No. 2; (u) Rex's similar arrangement for the rentals on his leased lands to flow into Farm Account No. 3; (v) Rex's confessed lack of knowledge, in spite of his being president of Industries, as to the handling of the cold storage building's rent between October 1951 and March 1952; (w) the allocation and payment of farm expenses to and from the accounts as earmarked for the respective farms; (x) Industries' failure currently to maintain books and records and having them prepared only annually from invoices, checks and bank statements; (y) the absence of evidence that any taxpayer ever received amounts from either of the accounts not earmarked to him; (z) the facts that Hubert's properties were already in corporate form; (aa) the absence of evidence of any real corporate activity other than the collection of rentals and the provision of a very confined and earmarked conduit for funds to the taxpayers; and (bb) the absence of evidence of anything more than rare routine corporate activity and corporate meetings "very seldom held".

While any one of these factors standing alone would probably not be persuasive, together they present, it seems to us, a *total* situation of significance. In the aggregate they give us an overall detailed portrait of a corporate form which is no more than the alter ego of the taxpayers, a form which may have had a distinct tax purpose but one with no reality during the three years in question beyond the lessening of tax burdens which would otherwise exist with respect to the several taxpayers' developed and income producing assets.

The additional fact that Industries purchased farm property in 1958 affords no counterbalance and possesses little significance for the 1952–4 period as to which the listed factors have particular pertinence. The same can be said of the additional facts that Industries had been in existence as a separate taxable entity and had always been owned by the same shareholders. National Investors Corporation v. Hoey, supra, 2 Cir., 1944, 144 F.2d 466, 468. It is true that Industries was not a corporation with a ready-made net operating loss carry over which the taxpayers searched for and acquired on the outside for tax benefit purposes (a situation to which § 129 of the 1939 Code, 26 U.S.C.A. § 129, might have had application). This, however, by no means prevents the conclusion that the facts here disclose no more than an attempt after its fiscal year 1951 to balance Industries' net operating loss carry over from its former manufacturing operations against the net income of the taxpayers' already established farming and real estate operations.

We therefore conclude that, accepting the very tests and standards proposed by the taxpayers, everything other than tax motivation fades under the glare of analysis. All that has been shown, Knetsch tells us, p. 366 of 364 U.S., p. 135 of 81 S.Ct., then provides "nothing of substance". See, also, Paymer v. Commissioner, 2 Cir., 1945, 150 F.2d 334, 336–337; Jackson v. Commissioner, 2 Cir., 1956, 233 F.2d 289; Factor v. Commissioner, 9 Cir., 1960, 281 F.2d 100, 110–113, cert. den. 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365; Alpha Tank & Sheet Metal Mfg. Co. v. United States, 1953, 116 F.Supp. 721, 126 Ct.Cl. 878; Aldon Homes, Inc., 1959, 33 T.C. 582, 596–597; Shaw Construction Co., 1961, 35 T.C. 1102, 1113–1114; 7 Mertens, The Law of Federal Income Taxation, §§ 38.-07, 38.10, 38.12. Compare James Realty Co. v. United States, 8 Cir., 1960, 280 F.2d 394, 399–402, and Schoenberg v. Commissioner, supra, 8 Cir., 1962, 302 F.2d 416.

The taxpayers vigorously complain, finally, about the trial court's specific findings that Industries had no employees, that it did no farming or farm management, that it engaged in no acts or functions different than those which

existed before, that the individuals continued to manage the property as before, and that the 1953 sale was without release by the corporation, without consideration to it, and with the growing wheat reserved to George and his wife. They assert that all these are clearly erroneous. They cite the Fifth Circuit cases of Montgomery v. Commissioner, 1956, 230 F.2d 472 and Henson v. Commissioner, 1949, 174 F.2d 846, where husband-to-wife transfers of business properties were recognized, and the Supreme Court's words in National Carbide Corp. v. Commissioner, 1949, 336 U.S. 422, 433, 69 S.Ct. 726, 93 L.Ed. 779, recognizing independence there for tax purposes despite control.

If the corporate form here were to be regarded as determinative for tax purposes, then the taxpayers' complaint would be meritorious. This, however, presupposes the resolution of the very issue before us. We regard the challenged findings as based on the trial court's considered realistic view of the operations to the effect that the employees were those of the taxpayers as owners rather than those of Industries, and so on. In any event, even if the findings should have been drawn and made to show the interposition of the corporation—and hence even if one could say that the findings are technically erroneous—the trial court's result and ours obviously would be no different. Its conclusion was that the form here was ineffective. This and not any technical imperfection of its findings is the important feature and the fulcrum of the case.

Our holding is not, of course, to be regarded as indicative of our denial of tax recognition of all operations of closely held corporations. The Supreme Court recognized, in Knetsch, supra, p. 366 of 364 U.S., p. 135 of 81 S.Ct. that "There may well be" situations of the type therein considered "with nontax substance" which would achieve tax recognition. We, too, recognize that possibility in the general factual area in which

this case falls but we approve the trial court's conclusions here, as the Supreme Court did there, to the effect that "this one is a sham".

This makes it unnecessary for us to consider the government's alternative argument that the income allocation was properly made under § 45 of the 1939 Code, and we specifically do not pass upon that issue.

The district court's judgments of dismissal of the three cases were proper. Those judgments are affirmed.