GEORGE SARKISIAN and BARBARA SARKISIAN, JOHN SARKISIAN and JACQUELINE SARKISIAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sarkisian v. Commissioner
Docket Nos. 2083-79, 358-80.
United States Tax Court
T.C. Memo 1982-199; 1982 Tax Ct. Memo LEXIS 549; 43 T.C.M. (CCH) 1074; T.C.M. (RIA) 82199; April 14, 1982. Peter L. Faber, for the petitioners. Kenneth Bersani, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Chief Judge:[1] Respondent determined deficiencies in petitioners' Federal income tax as follows: Docket No.
1972
1973
1975
2083-79
George and Barbara
$ 767.48
$ 128,587.09
Sarkisian
John and Jacqueline
767.54
129,107.02
Sarkisian
358-80
George and Barbara
$ 20,571.00
Sarkisian
John and Jacqueline
20,631.00
Sarkisian
Concessions having been made, only the following amounts are in dispute: 1973
1975
George and Barbara Sarkisian
$ 13,325.00
$ 20,571.00
John and Jacqueline Sarkisian
13,330.00
20,631.00
*550 We must determine whether the net operating losses from the management of an office building are those of petitioners' partnership or petitioners' wholly owned corporation. This case was submitted fully stipulated pursuant to Rule 122. [2] The stipulation of facts is incorporated by this reference. Petitioners George Sarkisian and Barbara Sarkisian are married individuals who, at the time the petitions in this case were filed, resided in Binghamton, New York. Petitioners John Sarkisian and Jacqueline Sarkisian are married individuals who, at the time the petitions in this case were filed, resided in Vestal, New York. At all times relevent hereto, George and John Sarkisian [3] were the sole partners in Sarbro Realty Company (Sarbro Realty); petitioners shared equally in partnership income and losses. In early 1969, petitioners were approached by John Thompson, the Executive Director of the Binghamton Urban Renewal Agency (Agency), a public benefit corporation established under the laws of the State of New York. Mr. Thompson was disturbed that there had been no local involvement in the *551 urban renewal program in the downtown Binghamton area in the past five years and solicited petitioners to build a commercial development in downtown Binghamton on land owned by the Agnecy. On December 24, 1969, petitioners signed a Redevelopment Agreement with the Agency, pursuant to which petitioners were personally obligated to build an office building. Until the Agency issued a certificate of completion, it retained the right to re-enter and take possession of the property and revest title in itself. By deed dated August 14, 1970, and recorded September 16, 1970, the Agency conveyed certain real property, consisting of vacant land located at Chenango and Henry Streets in the City of Binghamton, New York, to petitioners as tenants in common. Petitioners, as individuals, paid $ 77,500 to the Agnecy for the land. Pursuant to the terms of the deed, petitioners individually were obligated to construct an office building on the property in accordance with the Redevelopment Agreement. On October 21, 1969, petitioners *552 entered into a Partnership Agreement with Robert Matthews (Matthews) and Richard Meltzer (Meltzer). It was anticipated that petitioners would contribute the office building to the partnership after the construction was completed and that Matthews would arrange financing for the project. In 1970, construction of the office building commenced. Construction was undertaken by Sarkisian Brothers, Inc. (Sarkisian Brothers), a corporation wholly owned by petitioners. A dispute arose between petitioners and Matthews and Meltzer, and the partnership was dissolved. As a result of the dissolution of this partnership, petitioners were left without access to financing for the construction. Significant sums of money ($ 503,594.57 through October 1972) had been advanced for the construction by Sarkisian Brothers, and petitioners sought mortgage financing for the completion of the project so that the corporation could be reimbursed for its expenditures. Petitioners, as individuals, [4] sought mortgage financing for the project through H.J. Ludington, Inc. (Ludington), mortgage investment bankers. Petitioners were informed by Paul Tschopp of Ludington that, because New York usury law imposed *553 a ceiling of 7-1/2 percent on the interest rates chargeable to individuals, they would be unable to obtain financing for the project unless they formed a corporation to be the nominal borrower. On July 13, 1972, petitioners applied to Ludington for a mortgage loan on behalf of "A Corporation to be formed." On August 2, 1972, Ludington issued a mortgage loan commitment letter to a "Corporation to Be Formed," c/o George Sarkisian. At the time the commitment letter was issued, no corporation was in existence to obtain the loan. Centre Plaza of Binghamton, Inc. (Centre Plaza) was incorporated on October 3, 1972, pursuant to section 402 of the Business Corporation Law of the State of New York. Centre Plaza was incorporated to hold legal title to the real property for petitioners to enable *554 them to obtain mortgage financing. By deed dated October 31, 1972, and recorded November 3, 1972, petitioners conveyed legal title to the real property to Centre Plaza. The mortgage loan arranged by Ludington was brokered through Manufacturers and Traders Trust Company (Trust Company) of Buffalo, New York. At the time the deed was executed, the Building Loan Agreement and the Bond and Mortgage were executed by George on behalf of Centre Plaza. Also on October 31, 1972, petitioners individually signed a personal guaranty and indemnity in the full amount of the Trust Company loan. Centre Plaza had no assets other than legal title to the property. Petitioners received no consideration for the conveyance of the property to Centre Plaza other than the right to receive stock of Centre Plaza. Centre Plaza never issued any stock; it never held any director or shareholder meetings. Centre Plaza had no telephone, no office, and no employees and did not pay any salaries. Centre Plaza never opened or maintained any bank account; it maintained no books, records, or financial statements. From November 1972 through May 1973, construction draws on the mortgage loan totaling $ 467,600 *555 were deposited directly to the account of Sarkisian Brothers and were never deposited into a bank account of Centre Plaza. The draws were to reimburse Sarkisian Brothers for expenditures on the construction of the project. At all times relevant herein, Sarbro Realty actually carried out the management and operation of the property and was used by petitioners to own, manage, and operate several other properties. Of the four office building leases stipulated into evidence, three were executed in the name of Centre Plaza and one lease was executed in the name of Sarkisian Brothers. On two of the three leases in the name of Centre Plaza and the lease in the name of Sarkisian Brothers, the rent checks were payable to Sarkisian Brothers, Inc., or Sarkisian Brothers, or George and John Sarkisian. Rent checks on the third lease in the name of Centre Plaza were payable to Centre Plaza. All rental receipts were deposited directly to the accounts of Sarbro Realty and all payments on the mortgage loans were made by Sarbro Realty. Insurance on the property was maintained under a blanket commercial account policy with Continental Casualty Company. Although "Centre Plaza Corp." was listed *556 as one of the named insureds, no corporation by that name ever existed; "Centre Plaza of Binghamton, Inc.," was not listed as a named insured. Nevertheless, the parties are not contesting the fact that the property was validly insured during the periods in question. From 1973 through 1976, city and school taxes attributable to the property were billed by the City of Binghamton to Centre Plaza. During 1973 and 1975, the income in connection with the management of the property was $ 40,768.67 and $ 64,469.04; the expenses (including city and school taxes) were $ 83,762.01 and $ 148,698.09. [5] Thus, losses of $ 42,993.34 and $ 84,229.05 were realized in 1973 and 1975. By deed dated December 21, 1976, and recorded in the Broome County Clerk's Office on December 30, 1976, Centre Plaza reconveyed legal title to the property to petitioners as tenants in common. The deed provided that petitioners would assume the first mortgage debt. Reconveyance of title to the property from Centre Plaza to petitioners before this *557 time had been overlooked but no significance had been attached to it; petitioners had regarded themselves as the real and beneficial owners of the property. Permanent financing was obtained on December 30, 1976, through Chemical Bank of Binghamton in the form of a second mortgage loan to petitioners individually in the amount of $ 82,400 and a consolidation with the outstanding balance of $ 467,000 on the first loan. During the years in issue, Centre Plaza did not file Federal income tax returns or New York State franchise tax returns. After the property had been reconveyed to petitioners, they were notified that Centre Plaza would be legally dissolved unless New York State franchise returns were filed. The returns were then filed retroactively, showing no assets or income; the minimum franchise tax was paid by a Sarbro Realty check. In November 1977, Centre Plaza filed untimely U.S. Corporation Income Tax Returns for the taxable years 1972 through 1976. Each return stated that the corporation was inactive, and that it had no income, deductions, credits, assets, or liabilities other than a deduction each year for the New York State franchise tax paid. For the years at issue, *558 petitioners treated the losses incurred in connection with the property as losses of Sarbro Realty and each petitioner reported his distributive share of the loss on his individual return. OPINION Respondent has determined that the net operating losses arising out of the management and operation of the property are properly reportable as losses of the corporation, Centre Plaza, rather than of the partnership, Sarbro Realty. Petitioners argue that: (1) we should disregard the corporate existence of Centre Plaza because it did not engage in sufficient business activities to constitute a taxable entity; and (2) Centre Plaza was a mere agent for holding legal title to the property on behalf of Sarbro Realty, the beneficial owner of the property. In this case, were we to adopt either one of petitioners' contentions the result would be the same: Sarbro Realty would be entitled to the losses attributable to the property. The "disregard" and the "agency" arguments, however, must be viewed as alternative rather than cumulative positions. A holding that the corporation is to be ignored is premised on the conclusion that the corporation was a "dummy" or a "sham"; for income tax purposes, *559 we tax the transaction as if the corporation were never formed. The agency theory, on the other hand, asks whether an admittedly existing corporation is taxable on the income from the property in question; it requires a factual determination as to whether the corporation, in holding legal title to the property, is acting merely as an agent of the partnership so that the corporation's actions are attributable to its principal. See generally, Miller, "The Nominee Conundrum: The Live Dummy is Dead, but the Dead Dummy Should Live," 34 Tax L. Rev. 213 (1979). We will first address petitioners' contention that the corporate existence of Centre Plaza should be disregarded for tax purposes. The crux of petitioners' argument is that they formed the corporation for the sole purpose of avoiding the New York usury statute and that Centre Plaza did not engage in sufficient business activities for it to be regarded as a separate taxable entity. As we said in Strong v. Commissioner,66 T.C. 12, 21-22 (1976), affd. without published opinion, 553 F.2d 94 (2d Cir. 1977) -- The principal guidepost on the road to recognition of the corporate entity *560 is Moline Properties v.Commissioner,319 U.S. 436 (1943). * * * The Court held that the corporation was a separate entity from its inception, and stated its rule of decision as follows: The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains separate taxable entity. * * * In Burnet v. Commonwealth Improvement Co.,287 U.S. 415, this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantages of incorporation to do business, it was held, required the acceptance of the tax *561 disadvantages. [319 U.S. at 438-439. Fn. refs. omitted; emphasis supplied.] The existence of a closely held corporation will usually not be disregarded for tax purposes at the behest of its shareholders and "the income from property must be taxed to the corporate owner, and will not be attributed to the shareholders, unless the corporation is a purely passive dummy or is used for a tax-avoidance purpose," Strong v.Commissioner,supra at 22; it will not be disregarded merely because it is dominated by its shareholders, as this fact is characteristic of most closely held corporations. The degree of corporate purpose and activity mandating recognition of the corporation as a taxable entity is extremely low; the business activity may be minimal. Strongv. Commissioner,supra at 24. In Strong, we declined to ignore a corporation, formed to circumvent the New York usury statutes, which borrowed money, mortgaged property, and received and applied the loan proceeds. In Ogiony v. Commissioner,617 F.2d 14 (2d Cir. 1980), *562 affg. a Memorandum Opinion of this Court, the Second Circuit, to which an appeal in this case lies, refused to disregard two corporations utilized to hold title to and obtain mortgages on land and to transfer the loan proceeds to partnerships which constructed and operated apartment buildings on the land.In so holding, the Second Circuit specifically agreed and reaffirmed the above-quoted language from our opinion in Strongv. Commissioner,supra at 22, relating to the limited circumstances under which income from property will be attributed to shareholders rather than the corporate owner. See 617 F.2d at 16. [6]
Petitioner seeks to distinguish the activities Centre Plaza engaged in from those engaged *563 in by the corporations whose existence was recognized in Oqiony,Strong, and numerous other cases. See, e.g., Paymer v. Commissioner,150 F.2d 334 (2d Cir. 1945), affg. in part and revg. in part a Memorandum Opinion of this Court; Collins v.United States,386 F. Supp. 17 (S.D. Ga. 1974), affd. per curiam 514 F.2d 1282 (5th Cir. 1975). [7] We do not believe those cases are fairly distinguishable and hold that Centre Plaza's purpose and activities were sufficient to require its recognition as a separate taxable entity. The corporation was formed for a business purpose, within the meaning of Moline Properties v. Commissioner,319 U.S. 436 (1943), i.e., to circumvent State usury laws. See Strong v. Commissioner,supra at 24. The corporation held title to and mortgaged property, borrowed money, entered into several leases with respect to the property, and several rent checks were made payable to it. We recognize that there are many corporate formalities that Centre Plaza did not observe and activities which it could have engaged in but did not, e.g., it issued no stock, held no director's *564 meetings, had no bank account and kept no books or records. It is true that the corporation was dominated by its shareholders who often ignored the corporate structure, but this is true of many closely held corporations. Centre Plaza was formed for a business purpose, "to gain an advantage under the law of the state of incorporation," Moline Properties v. Commissioner,supra at 438, and it engaged in business activities consistent with that purpose. "The choice of the advantages of incorporation to do business * * * require[s] the acceptance of the tax disadvantages." Moline Properties v.Commissioner,supra at 439. *565 Petitioners argue that, even if upon its incorporation Centre Plaza became a separate taxable entity, it should be disregarded as of the date the business purpose for its formation ended. Thus, petitioners argue, since the corporation was formed to borrow money, once the loan and mortgage documents were signed on October 31, 1972, the corporation's purpose was fulfilled and from then on for tax purposes we should disregard its existence. This argument ignores the fact that Centre Plaza did not remain inactive after October 31, 1972. From 1972 through 1975, Centre Plaza, as a lessor, executed leases for terms of three to ten years. Petitioners' own actions as incorporators, officers, and shareholders of Centre Plaza are inconsistent with their argument that, for all practical purposes, Centre Plaza ceased to exist shortly after its incorporation. Pursuant to its certificate of incorporation, Centre Plaza enjoyed broader powers than merely the ability to obtain financing for one parcel of property. Petitioners made no efforts towards liquidating the corporation. Instead, when petitioners were informed in 1977 that Centre Plaza was subject to dissolution for failure to file franchise *566 tax returns, petitioners filed such returns to prevent such dissolution. Finally, although not determinative, the use of the corporate vehicle carried with it the usual baggage attending incorporation, including limitation of the shareholders' personal liability (the fact that petitioners voluntarily guaranteed the Trust Company loan does not override the legal significance of this limitation). We have reviewed those cases cited by petitioners in support of their argument that we should disregard the corporation after the loan was obtained and have found them to be distinguishable. In Haberman Farms, Inc. v. United States,305 F.2d 787 (8th Cir. 1962), the Court held that, when a corporation which was originally formed for a business purpose abandoned that purpose, ceased all activity with respect thereto, and was thereafter employed only as a device for tax avoidance, the income of the corporation was properly attributable to its shareholder. In the present case, however, Centre Plaza was formed for, and throughout its existence its activities were to further, a legitimate nontax business purpose. The Court's holding in Haberman Farms is "not * * * to be regarded *567 as indicative of [the] denial of tax recognition of all operations of closely held corporations." 305 F.2d at 794. NationalInvestors Corp. v. Hoey,144 F.2d 466 (2d Cir. 1944), also relied on by petitioners, involved factual circumstances similar to those which existed in Haberman Farms.
Since we have rejected petitioners' contention that the existence of Centra Plaza should be disregarded for tax purposes, we must decide whether, as petitioners argue, Centre Plaza's status with respect to the property was merely that of an agent for Sarbro Realty. Petitioners, relying on our decision in Roccaforte v. Commissioner,77 T.C. 263 (1981), on appeal (5th Cir. Feb. 4, 1982), assert that Centre Plaza was an agent of Sarbro Realty and that the actions of the corporation for or on behalf of the partnership should be attributed to the partnership. In Roccaforte, there was a written agency agreement between the corporation and the partnership, the principal-agency relationship was clearly disclosed to third paries with whom the corporation dealt, the partners were bound by the actions of the corporate agent, and the activities *568 of the corporation were consistent with the normal duties of an agent. Based on those facts, we held that the corporation which was formed to circumvent State usury laws and which held legal title to an apartment complex was not the owner of the property for Federal tax purposes. 77 T.C. at 288. Whether or not a principal-agency relationship existed between Sarbro Realty and Centre Plaza is a factual question. Because closely held corporations are often controlled directly by their shareholders in the same manner that agents are controlled by their principals, many facts which might indicate a principal-agency relationship also aptly describe the relationship between a controlling shareholder and his corporation. Petitioners, who have the burden of proof, see Rule 142(a), must present evidence from which we can conclude that, rather than the corporation and partnership merely being two entities owned by the same persons, Centre Plaza was, in fact, the agent of Sarbro Realty.
In determining whether or not a principal-agency relationship exists, the Supreme Court in National CarbideCorp. v. Commissioner,336 U.S. 422 (1949), *569 identified a number of factors which are to be considered: Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of the employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. [336 U.S. at 437. Fn. refs. omitted.] See also Jones v. Commissioner,640 F.2d 745 (5th Cir. 1981), affg. a Memorandum Opinion of this Court; and Roccaforte v. Commissioner,supra.Based on an analysis of the record in this case in light of the criteria enumerated above (and discussed below), we conclude that Centre Plaza was not an agent of Sarbro Realty. Although a written agency agreement is not determinative of a principal-agency relationship, *570 it is one of the indicia to be considered. See Roccaforte v. Commissioner,supra at 283. In the present case, there was no written agreement. Furthermore, Centre Plaza's certificate of incorporation does not limit the corporation's permissible activities to those undertaken by an agent in holding title to real estate. The documents executed by Centre Plaza in connection with its financing and leasing of the property were executed in the name of Centre Plaza by "George Sarkisian, President" [8] and bear no reference to Centre Plaza's alleged agency status. The record is devoid of any evidence that Centre Plaza's fiduciary relationship was disclosed to lenders, lessees, or anyone else who dealt with the corporation. Even if we infer that the Trust Company knew that Centre Plaza was owned by Sarbro's partners, this alone would not be sufficient evidence that the corporation was an agent of the partnership. [9] Petitioners' guaranty of the loan to their corporation is as consistent with their relationship as controlling shareholders of a corporation as with a principalagency relationship. *571 In Roccaforte v. Commissioner,77 T.C. 263 (1981), we found that the partners were bound by the actions of the corporation; the partners committed themselves to indemnify the corporation for all acts and debts related to the apartment complex.In the present case, petitioners, by virtue of their guaranty, were liable on the Trust Company loan. With respect to other third parties (e.g., tort claimant, lessee, utility company), however, it appears that petitioner retained the benefit of limited liability afforded by the corporation. To be sure, Centre Plaza maintained no bank accounts; loan receipts were transferred directly to Sarkisian Brothers and it appears that income and expenses attributable to the office building were deposited to and paid out of Sarbro Realty's accounts (see note 5, supra). These factors, though tending to support petitioner's view of the case, are not sufficient to outweigh the evidence supporting respondent's contentions. We have also considered whether the income received is attributable to property and employees of the principal or of the agent. It seems clear that employees of Sarbro Realty performed the services rendered *572 in connection with the ongoing management of the property. Likewise, petitioners contend that Sarbro Realty (or at least its partners) [10] is the real (i.e., beneficial) owner of the property. Roccaforte v.Commissioner,supra.Accepting petitioners' contention for purposes of argument, it is clear that the beneficial ownership of the property, while relevant, is not determinative of to whom the income belongs for tax purposes. To hold otherwise would be to make irrelevant all the other factors which the decided cases mandate should be taken into account. Moreover, as the Court of Appeals, faced with similar facts in Jones v. Commissioner,supra at 753, stated, "this element lends little weight to taxpayers' argument." Also supporting respondent's position is that, in this case, the corporation's relationship with the partnership was dependent on the fact that both entities were owned by the same *573 persons. Petitioners were the sole partners in Sarbro Realty and the only persons having an interest in Centre Plaza. The corporation and the partnership did not deal with each other at arm's length; the corporation was not compensated for its services. See Roccaforte v. Commissioner,supra at 287. Thus, although the corporation's activities were not inconsistent with those that might be performed by an agent, they were equally consistent with the activities performed by a closely held corporation dominated by its shareholders. In sum, based on the record in this case, we conclude that Centre Plaza was not an agent of Sarbro Realty. [10]
In the original brief, relying on Ogiony v. Commissioner,T.C. Memo. 1979-32, *574 affd. 617 F.2d 14 (2d Cir. 1980), petitioners also argue that Sarbro Realty was entitled to deduct certain of the expenses involved herein on the ground that they were attributable to the partnership's own activities in connection with the operation and management of the property. The short answer to this argument is that the record in this fully stipulated case, unlike the record in Ogiony, simply does not contain sufficient evidence from which any such allocation can be made, with the result that the argument must be rejected on the ground that petitioners have failed to carry their burden of proof. Rule 142(a). [11]
In sum, the corporate existence of Centre Plaza cannot be disregarded for tax purposes and petitioners have not established that Centre Plaza was an agent of Sarbro Realty. *575 Decisions will be entered for the respondent.
Footnotes
1. By order dated June 29, 1981, this case was reassigned from Judge Sheldon V. Ekman to Judge Theodore Tannenwald, Jr.↩
2. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
3. Barbara and Jacqueline are parties solely by reason of having filed joint returns with George and John. All references to petitioners will be to George and John.↩
4. All previous building projects owned and operated by petitioners had been financed from their own funds. Mortgage financing had previously been obtained in their individual names only after the projects had been completed. Petitioners' previous projects (exclusive of their personal residences) consisted of three post offices, a hardware store, a warehouse, and a piece of rental property.↩
5. The stipulation does not indicate who paid these expenses, but we think it a fair inference from the record as a whole that they were paid by Sarbro Realty.↩
6. Because the issue of recognition of a corporation as a separate taxable entity turns on factual variations, Golsenv. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), does not directly apply but, given the clear position taken by the Second Circuit in Strong and Ogiony,↩ we think that the fact that this case is appealable to the same circuit should not be overlooked.
7. See also Linczer v. Commissioner,T.C. Memo. 1980-139, in which we refused to disregard the existence of a corporation whose activities were virtually the same as Centre Plaza's. The corporation in Linczer↩ purchased property, borrowed money, and mortgaged the property. Rental proceeds were deposited in an account in its shareholder's name; and all expenses were paid by the shareholder from that account. The corporation filed Federal and New York State corporate income tax returns indicating no income and no expenses.
8. One lease of a portion of the office building, for reasons not explained, shows Sarkisian Brothers, Inc. as the lessor. ↩
9. The stipulation of facts merely states that petitioners were informed that "they would be unable to obtain financing for the project unless they formed a corporation to be the nominal owner" (a stipulation which does not, as petitioners contend, constitute a concession by respondent that Centre Plaza was the nominal owner) and that petitioners "regarded themselves as the real and beneficial owners of the property."↩
10. The record contains no evidence that, after petitioners transferred title to the property from themselves to Centre Plaza, they transferred their right to stock or any other interest they had in Centre Plaza to the partnership.↩
10. Petitioners also rely on two of respondent's revenue rulings to support their position in this case. See Rev. Rul. 76-26, 1976-1 C.B. 10; Rev. Rul. 75-31, 1975-1 C.B. 10↩. Respondent's rulings were premised, inter alia, upon the fact that the agency status of the corporation was clearly reflected on corporate documents from the beginning and communicated to outsiders (including respondent). Such is not the case here.
11. The issue of the extent of the deductions by Centre Plaza against the income from the property is not before us (although it appears that at least an offsetting amount would be available) nor have any issues been raised as to the dividends from, or contributions to the capital of, the corporation. See Klausner v. Commissioner,T.C. Memo. 1978-405↩.